```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                          NORTHERN DIVISION

 3

 4   CHEVELLE MCALISTER                                    PLAINTIFF

 5   VERSUS                 CIVIL ACTION NO. 5:22-cv-00090-DCB-LGI

 6   MANAGEMENT AND TRAINING CORPORATION, ET AL.        DEFENDANTS

 7

 8                        OMNIBUS PROCEEDINGS
 9          BEFORE THE HONORABLE LAKEYSHA GREER ISAAC,
                 UNITED STATES MAGISTRATE JUDGE,
10                      OCTOBER 18, 2023,
                      JACKSON, MISSISSIPPI
11

12

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:     CHEVELLE MCALISTER (PRO SE)

16

17   FOR THE DEFENDANTS:    THOMAS R. JULIAN, ESQ.

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

**TABLE OF CONTENTS**

Style and appearances....................................  1

Questions by the Court...................................  8

Questions by Mr. Julian.................................. 19

Court Reporter's Certificate............................. 34

```
 1              IN OPEN COURT, OCTOBER 18, 2023

 2

 3         THE COURT:  All right.  Good morning, everyone.  You

 4    may be seated.

 5         All right.  Mr. McAlister?

 6         THE PLAINTIFF:  Yes, ma'am.

 7         THE COURT:  All right.  Would you raise your right hand

 8    for me, sir?

 9         (Whereupon, the witness was placed under oath.)

10         THE COURT:  All right.  Thank you, sir.  You can put

11    your hand down.

12         I would advise you that you are now under oath and that

13    as a result I'm asking you to answer any and all questions

14    from me or from counsel for the defense truthfully.

15         Okay?

16         THE PLAINTIFF:  Yes, ma'am.

17         THE COURT:  All right.  And tell me your name for the

18    record, please.

19         THE PLAINTIFF:  Chevelle McAlister.

20         THE COURT:  Okay.  And then let's have introductions

21    from counsel for the defense.  Mr. Julian, if you'd

22    introduce yourself for the record --

23         MR. JULIAN:  Yes, ma'am.

24         THE COURT:  -- and the names of your clients, please.

25         MR. JULIAN:  All right.  Tom Julian for Management and
```

1    Training Corporation, Darrel Vannoy, Janaiya Bolden, Bianca

2    Reece, and Sa'Myni Bell.

3        THE COURT:  Thank you so much, Mr. Julian.

4        Okay.  Mr. McAlister, I want to explain to you a little

5    bit about what we are here for today.

6        Okay?

7        THE PLAINTIFF:  Yes, ma'am.

8        THE COURT:  We are here for what is called an omnibus

9    hearing, and I'll tell you what an omnibus hearing is.

10   Basically, it's an opportunity for the Court and for counsel

11   for the defense to explain -- to get a little more

12   information about your case, to hear from you, your

13   opportunity to explain in a little more detail about the

14   facts about your case, and an opportunity for you to just

15   tell us your story and for us to learn a little more.  So

16   today is not a trial of your case.  We are simply here to

17   learn more about the facts and try to clarify the nature of

18   your complaints.  So that's our purpose.

19       And I'm going to explain to you also a little about the

20   overall process of what's going to happen in your case, and

21   then I will ask you some questions about your case and give

22   Mr. Julian an opportunity to ask you some questions as well.

23       Okay?

24       THE PLAINTIFF:  Yes, ma'am.

25       THE COURT:  All right.  And I had not previously

1    introduced myself, but my name is Lakeysha Greer Isaac.  I'm

2    a United States Magistrate Judge here in the Southern

3    District of Mississippi, and I am the magistrate judge that

4    is assigned to your case.

5         So in federal court there are two judges assigned to

6    each and every case.  One judge is a magistrate judge, such

7    as myself, and the other judge is what is known as a

8    district judge.  And your case, as far as district judge is

9    concerned, is assigned to Judge David Bramlette.

10        So before we get into the main part of your hearing, I

11   want to talk to you a little bit and deal with a couple of

12   housekeeping matters, the first of which is to make a

13   determination about whether the parties are going to consent

14   to magistrate judge jurisdiction.  And let me explain to you

15   what that is.

16        As I said, two judges assigned to every case and two

17   judges assigned to your case right now, of which I am one.

18   The parties can consent to magistrate judge jurisdiction,

19   and what that means is that if that happens, I'll be the

20   only judge on your case going forward, and certainly you are

21   not required to consent, and if you don't choose to consent,

22   it's totally fine.  That's your right.

23        If you fail to consent, I'll still be writing the

24   opinions in your case and recommending to the district judge

25   rulings that would then have to be made by him called a

1    "report and recommendation."  So Judge Bramlette could then

2    either adopt my ruling or not adopt my ruling, and if he

3    didn't adopt my ruling, then he would write his own.

4        If the parties consent to magistrate judge

5    jurisdiction, essentially we would skip that step of writing

6    a recommendation, and I would just write the opinion

7    directly.  If you did consent, I would apply the same rules

8    of evidence, the same rules of civil procedure, and all of

9    the same law that Judge Bramlette would apply.  If I made a

10   decision that you disagreed with, you could then appeal that

11   decision to the Fifth Circuit Court of Appeals, just like

12   you could or would appeal a decision from Judge Bramlette.

13       So it's really just up to the parties as to how you

14   would like to proceed.  Generally, the major difference is

15   if you consent to magistrate judge jurisdiction, it may move

16   just a little bit quicker, because we have cut out the step

17   of writing a report and recommendation, and generally there

18   are more dates available for a trial in a magistrate judge's

19   calendar in comparison to a district judge.

20       So that's, in a nutshell, what consent means.  I wanted

21   to be sure that you understood it before we talked about it

22   further.

23       Do you have any questions about what it means to

24   consent to magistrate judge jurisdiction?

25       THE PLAINTIFF:  Not really.  Would that -- it would

1    mean I could decide or get to choose, something -- something

2    like that?

3        THE COURT:  Yes, sir.  We could either go forward

4    exactly as the case is now, with me being assigned as the

5    magistrate judge and Judge Bramlette as the district judge,

6    or we could proceed with me being the only judge on the

7    case.  So that's basically what it is.

8        And so at this time, I would like to ask you,

9    Mr. McAlister, do you consent to magistrate judge

10   jurisdiction in your case?

11       THE PLAINTIFF:  Yes, ma'am.

12       THE COURT:  Okay.  Mr. Julian, on behalf of the

13   defendants, do your clients consent to magistrate judge

14   jurisdiction?

15       MR. JULIAN:  We do.

16       THE COURT:  Okay.  Thank you, sir.

17       Bring you all some information.  All right.  Thank you

18   so much, Ms. Spears.

19       Mr. McAlister, we have one other thing that I want to

20   be sure that you are aware of before we move on.  I want to

21   be sure that you are aware of the Court's three-strikes

22   procedure.

23       Are you familiar with the three-strikes procedure?

24       THE PLAINTIFF:  Sort of.

25       THE COURT:  Okay.  I'll explain it to you.  I'll give

1    you the Court's definition of it so that we can be sure that

2    we are on the same page.

3        That is a procedure that provides that if you file

4    three or more lawsuits while detained and those are deemed

5    to be frivolous, malicious, or failing to state a claim,

6    then you wouldn't be able to pursue IFP status in any other

7    lawsuit, unless there is some kind of threat of serious

8    immediate harm to you.  And, of course, IFP is the status

9    where you don't have to pay to file a lawsuit.

10        So do you understand that three-strikes procedure?

11        THE PLAINTIFF:  Yes, ma'am.

12        THE COURT:  Okay.  And now, having heard about the

13    three strikes procedure and indicating that you understand

14    it, do you wish to move forward with your lawsuit today?

15        THE PLAINTIFF:  Yes, ma'am.

16        THE COURT:  Okay.  Thank you, sir.

17                        **CHEVELLE MCALISTER,**

18        having been first duly sworn, was examined and

19    testified, as follows...

20                        **EXAMINATION**

21    **BY THE COURT:**

22    Q.    All right.  So at this time, we are going to walk through

23    some of the facts regarding your case, as I indicated before.

24        So in this matter you have sued several individuals as

25    well as a corporate entity.  You have sued Management and

1    Training Corporation, Warden Darrel Vannoy, Major

2    Schoettmer -- I may not be pronouncing that correctly --

3    Sergeant Bianca Reece, Officer Sa'Myni Bell, and Officer

4    Janaiya Bolden.

5        And so what I want to do is give you a chance to just

6    tell me generally why you are filing this particular lawsuit,

7    what caused you to file it, and then I want you to tell me

8    specifically why you are suing each defendant.

9        So what I'll do first is give you an opportunity to just

10    tell me briefly about why you are filing your case.

11   A.   Well, I filed the case because they had -- they had

12    inmates that wasn't supposed to be around me -- around me.

13    They really wasn't supposed to be on the zone with me, period,

14    and I was attacked by one of the inmates.  I was hit with a --

15    like I said, with a mopstick; you know what I'm saying?  So I

16    had to defend myself or whatever, whatnot, and there wasn't

17    nobody there to help or nobody to have any type of assistance.

18    So, you know, I felt like that me being attacked like that,

19    something need to be done about that.

20        That's why I filed the lawsuit.  And the reason why I

21    filed so many lawsuits, because I wanted to make sure that I

22    did the right thing.  You know, you got -- you got individual

23    capacities and stuff like that.  So I had to do it to where it

24    size up to what I was reading, you know.  So I made sure that

25    everything was right.

1        And Sergeant Reece, she was a sergeant --

2    Q.   And if you will hold off a second on the individual

3    people, I'm going to walk you through each one.  Okay?

4    A.   Yes, ma'am.

5    Q.   All right.

6    A.   Okay.

7    Q.   All right.  Is there anything else you wanted to say --

8    A.   No, ma'am.

9    Q.   -- about generally?

10        Okay.  So let's walk through each one of them.  Okay?

11   A.   Yes, ma'am.

12   Q.   So let's start with MTC, Management and Training

13   Corporation.  Why is it that you filed suit specifically

14   against MTC?

15   A.   Well, it's actually the second time that -- that I had an

16   incident on the PC zone.  The first time I had an incident was

17   a while back, and they let me go home.  I got stabbed five

18   times.  And I -- I tried to file a lawsuit then, but I really

19   didn't know what I was doing, so I didn't do it.  And I

20   didn't -- when I got to my ARP, to the end of it, I just

21   didn't do nothing else, and they let me go -- they let me go

22   home.

23        So I said, well, if I ever run into a situation like that

24   again, I'm going to do it the right way.  You know, this time

25   I ran into it, it was -- it was -- it was the right way.  So I

1  had -- I had to do what I had to do, you know.

2  Q.   The first incident that you are talking about, did that

3  happen at Wilkinson County --

4  A.   Yes, ma'am.

5  Q.   -- or were you in another facility?

6       Wilkinson County.  And --

7  A.   It actually happened on -- on -- on the zone right next

8  to the zone that this incident happened on.  And I was in

9  protective custody also, which was another failure to protect.

10 Q.   What year did the prior incident happen?

11 A.   This happened back in -- I want to say like 2012.  A

12 while back.

13 Q.   Okay.  And then the current incident for which you filed

14 suit happened on July 25th, 2022; is that correct?

15 A.   I think so.  I mean, I'm --

16 Q.   Okay.  If that's what you listed in your papers, would

17 that be correct?

18 A.   Okay.  Well, yes, ma'am.

19 Q.   Okay.  All right.  Continue telling me as to why you are

20 suing MTC.  Was there anything else specifically as to MTC

21 regarding this July 2022 incident?

22 A.   I feel like that -- that they got it wrong.  You know, if

23 the MDOC SOP policy says that you shouldn't have -- you

24 shouldn't have C custody inmates with medium custody inmates,

25 then you shouldn't do that, because if you do do that, you

1  will have an incident like this, you know.  So that's the main

2  reason why.

3  Q.   Okay.  And we are going to walk through now each of the

4  individuals that you have sued.  Okay?

5       Let's start with the warden, Mr. Darrel Vannoy.  Tell me

6  why you have sued Mr. Vannoy.

7  A.   Okay.  Well, obviously he had -- he had to tell the

8  major -- my understanding, they was letting the C custody and

9  medium custody out to go -- to go to a church, a church

10 meeting.  And they had to come from somebody.  So the warden

11 had to tell Major Schoettmer -- I don't know if I pronounced

12 his name right.  I don't know how to say his name.  But he had

13 to give him the order to do this, to open these doors and let

14 these guys out, knowing that something like this can go on,

15 you know.

16 Q.   And how do you feel that your -- if you feel that your

17 rights were violated by Mr. Vannoy, how do you feel that they

18 were?  And you don't have to provide me, like, a specific

19 constitutional statutory provision.  I just want to know from

20 your perspective.

21 A.   Yes, ma'am.  Well, each one of them, I feel like that you

22 didn't prevent -- you knew that this could happen, and you

23 didn't try to prevent it.  You actually engaged in it and made

24 it happen, which made me feel like that it was -- it was

25 direct.

1       At first I felt like it was direct.  I thought that they

2   did this on purpose.  And I said, well, I'm not going to go

3   about it like that, because then that would be a personal

4   issue, and I don't have personal issues with none of them.  So

5   I stepped back and did it, you know, the correct way.  I tried

6   to calm myself in the correct way.

7   Q.   And let's move to talking about Major Schoettmer.  And if

8   at any point you remember something that you want to share

9   with me regarding MTC or Warden Vannoy, let me know.

10      But we will move forward now to Major Schoettmer.  Tell

11  me why you are suing Major Schoetner and -- Schoettmer.  And,

12  again, I'm probably not pronouncing it right either -- and

13  also, how or why you believe that your rights were violated by

14  this individual.

15  A.   Well, my remedies wasn't exhausted.  When I got to my --

16  to the last remedy, when I got to his office and talked to

17  him, he told me that I was the aggressor and told me that he

18  felt like that the situation is solved.

19      And also, the major -- I meant the warden.  I did leave

20  something out.  The warden, he -- he actually wrote in the --

21  one of the exhaust remedies, he wrote that me and my roommate

22  was placed back in the cell and we had medical attention and

23  there was no physical harm.  Well, this didn't even happen

24  with me and roommate, period.  This was me and another guy.

25  My roommate at the time was Randy Williams.  He on -- he's on

1  the zone with me right now, you know. So that was -- that was

2  wrong. So I feel like that my medical is kind of screwed up a

3  little bit, which I'm following up on that. Yes, ma'am.

4  Q.   All right. Anything else as far as Major Schoettmer is

5  concerned?

6  A.   No, ma'am. I just feel like -- I just feel like he

7  handled it unprofessionally.

8  Q.   All right. Let's talk about Sergeant Bianca Reece.

9  A.   Yes, ma'am. Well, she -- she know the situation. She

10  know not to let the C custody out like that. She already know

11  this. She been here for a long time, for years and years and

12  years. She know not to let the C custody out with the medium

13  custody, and she did it anyways. That made me feel like it

14  was personal.

15  Q.   All right. And how do you believe that she violated your

16  rights?

17  A.   The same thing. She knew that -- she knew that this

18  could happen and didn't do anything to prevent it.

19  Q.   Let's talk about Officer Sa'Myni Bell.

20  A.   Well, my understanding that they all -- they all had

21  participation in this act, which meaning somebody had to have

22  the keys to open the doors up, somebody had to let these guys

23  out and violate my rights. Those -- those three, Ms. Bell,

24  Ms. Bolden, and Ms. Reece, they all was on the zone. They was

25  on the zone when this happened. You know, they just watched.

1    Which I didn't expect them to really do much, because they

2    women; you know what I am saying?  So I didn't expect them

3    just to do much to help me, you know?  But, you know, I did

4    need some assistance at the moment.

5        So if you have to have some bigger guys to work there or

6    some -- some guys that's eating they -- they food or whatever

7    that they doing to -- to protect these inmates, you know, and

8    protect the custody zone, protection from harm, you know, then

9    you have to do what you got to do, because obviously these

10   women that you have are not capable enough to assist anybody,

11   most definitely when a person is getting attacked by somebody

12   else, and they just stand there and just watch.

13   Q.   You mentioned Officer Bolden, Officer Janaiya Bolden.

14   A.   Yes, ma'am.

15   Q.   Tell me any specific things that you are suing Officer

16   Bolden about and why you believe she violated your

17   constitutional rights.

18   A.   It's the same thing.  She knew -- she knew that this

19   situation could have occurred.  They all know not to let the C

20   custody out with the Black and whites.  They know -- they know

21   that.  The C custody inmates get an hour a day.  They come

22   out, and they lock them back down, and then the Black medium

23   custody come out, and they stay out all day for the rest of

24   the day.

25   Q.   Okay.  I want to go back now and get you to help me

 1   understand a little better exactly what happened that day.  So

 2   I want to walk you through a little bit more about the facts

 3   themselves.

 4        Now, at the time this happened, you were housed in

 5   protective custody?

 6   A.   Yes, ma'am.

 7   Q.   Okay.  How many inmates were involved in this incident?

 8   A.   Two.

 9   Q.   Two?

10   A.   Yes, ma'am.

11   Q.   Okay.  One of them that you mentioned in your paperwork

12   was a Daniel Hatten?

13   A.   Yes, ma'am.

14   Q.   And that's the person who attacked you?

15   A.   Yes, ma'am.

16   Q.   Okay.  Do you know the name of the other person?

17   A.   Naw.  I'm the other person.

18   Q.   Okay.  It was just the two of you all?

19   A.   Yes, ma'am.

20   Q.   Okay.  I want to be sure.  And, of course, you indicated

21   that you protected himself by -- you protected yourself by

22   stabbing him with a shank.

23        Did you know Mr. Hatten before this particular incident

24   happened?

25   A.   I did.  I did.

1   Q.   Okay.  How did you know him?

2   A.   I was at Parchman with him.

3   Q.   And had you all had any types of dealings with each other

4   since you both had been at Wilkinson County?

5   A.   I mean, not that I know of.  I felt like that he was on

6   drugs or something that made him react the way he reacted.

7   Q.   When was the last time you had seen or spoken to him

8   before this happened?

9   A.   Maybe three or four years.

10  Q.   All right.  How long would you say that this incident had

11  gone on before Sergeant Reece intervened?

12  A.   Maybe six or seven minutes -- five or six minutes.

13  Q.   Are you aware of whether Officer Bell or Officer Bolden

14  called for help in that time?

15  A.   I think -- I think Officer Bell did.  I think she was the

16  only one that did.  If I'm not mistaken, I think she did.

17  Q.   So initially, was it just Officer Bell and Officer Bolden

18  there and then Sergeant Reece arrived?

19  A.   I believe Reece -- Sergeant Reece was standing in the --

20  inside the control tower or outside the door in the hallway

21  one, so I really don't know where she was.

22  Q.   Okay.  Did Officers Bell and Bolden assist Sergeant Reece

23  in stopping the altercation?

24  A.   No, ma'am.

25  Q.   Are you making any type of claim regarding whether there

1  was any type of denial of medical care to you, or is your

2  claim based on the failure to protect?

3  A.   It's really based on the failure to protect.  But if

4  medical keep on -- keeps on, I guess, rejecting -- because at

5  SMCI, they got another -- medical is real, real terrible.  So

6  I'm trying to go about what I need to do to get myself

7  together, and it is taking so long.

8       You know, you send sick calls in, and they -- they come

9  to our building.  Sometime they come; sometime they don't.

10 They go through doctors, like, (inaudible) going north.  So I

11 don't know when I'll be able to have what I need to be able

12 to, you know, have myself together on that side, but I am

13 working on it.

14 Q.   Is there anything that you are claiming that the medical

15 team failed to do as it relates to this July 2022 incident?

16 A.   Yes, ma'am.  I actually told them that my leg was messed

17 up and my teeth was messed up.  I actually told them that, and

18 I do got sick calls where the guy said -- I can't remember the

19 doctor's name.  I should know his name.  I can't remember it.

20 But he said I had a fracture on the leg.

21      And then the dentist came, and he said that he didn't --

22 he didn't -- he didn't have time.  He said he didn't have time

23 to do it, have time to deal with what I was talking about.

24 So, of course, I got mad, and they took me back to the unit.

25 Q.   At this point have we discussed all of the claims that

1  you are making in your case and the persons that you are

2  making them against?

3  A.   Yes, ma'am.

4  Q.   Okay.  Thank you.

5       THE COURT:  I'm going to turn over to Mr. Julian at

6    this time.  And, Mr. Julian, you'll have an opportunity to

7    ask questions, sir.

8       MR. JULIAN:  Thank you.

9       THE COURT:  Okay.

10                      **EXAMINATION**

11  **BY MR. JULIAN:**

12  Q.   All right.  Mr. McAlister, you mentioned that they were

13  going to take y'all to church that morning.  Is that your

14  understanding of why they were letting y'all out of the cell?

15  A.   Yes, sir.

16  Q.   Okay.  So is it your recollection this occurred on a

17  Sunday morning?

18  A.   I really can't remember.  It's been -- been a while ago.

19  Q.   And you mentioned that it was your understanding that

20  this warden ordered the inmates to all attend the church

21  services together?

22  A.   No.  I said the warden had to inform the major to call

23  the shot to open the doors up like that.

24  Q.   Okay.  But you -- it was the warden's decision for that

25  to happen; is that right?

1    A.    I mean, it would have to be.

2    Q.    Okay.

3    A.    Or the major's.

4    Q.    And so for the Defendants Reece, Bell, Bolden, and

5    Schoettmer, them letting all of the inmates out would have

6    been in response to the warden's decision?

7    A.    Yes, sir.

8    Q.    So in other words, that wasn't their decision?

9    A.    Naw.  It wasn't they decision.  I don't believe so.  It

10   might have been part of Schoettmer's decision.

11   Q.    Schoettmer?

12   A.    Yes, sir.  I don't know how to say his name.

13   Q.    Okay.  But in other words, if the warden said that this

14   is the way he wanted it done, it was their job to do what he

15   told them?

16   A.    Right.

17   Q.    Okay.  And you mentioned that you had been in Parchman

18   with Mr. Hatten, but if I understood you correctly, y'all

19   weren't having any current issues when this attack occurred?

20   A.    No, sir.

21   Q.    Did you have any reason to anticipate he was going to

22   attack you?

23   A.    Not necessarily, besides knowing that he was going to

24   come out -- I mean, he said -- when Sergeant Reece came on the

25   zone, she had a few things to say that was drug related.  And,

1    I mean, I don't want to put his business out there, but he was

2    up there high.

3    Q.    I'm sorry?  He was what?

4    A.    He was upstairs high.

5    Q.    High?

6    A.    On drugs.  High.  High, H-I-G-H.

7    Q.    Before they let him out, he was hiding?

8    A.    He was high.  And he was telling Sergeant Reece, well,

9    these guys doing this, and these guys doing that.  And I was

10   telling Sergeant Reece -- I said, Sergeant Reece, well, you

11   know, them guys on drugs, you know.  And he got mad.  He said,

12   well, you know, you a snitch.  Why you telling the police this

13   and that?  He didn't know that they was fixing to open the

14   doors up and let him out.

15   Q.    This was immediately prior to the attack?

16   A.    Yes, sir.

17   Q.    Okay.  I'm sorry.  Let me walk through that, then.  You

18   said he was high?

19   A.    Yes, sir.

20   Q.    And how did you know he was high?

21   A.    Because I know -- I knew what was going on.  You know, we

22   stay out -- the Black and whites stay out all day.

23   Q.    Okay.  And you -- you said what to who about him being

24   high?

25   A.    Sergeant Reece.

1    Q.   What did you tell Sergeant Reece?

2    A.   I told her -- well, they call it "catching out."  They

3    will "catch out."  That mean people owe people money and they

4    leave owing the money.  And she was saying people need to stop

5    catching out off the zone and doing this and doing that.  And

6    he had some -- some to say real, real, crazy.  And I told

7    Sergeant Reece, I said, well, it's the guys that's getting

8    high that's catching out.  It's the guys owing money, they

9    doing drugs.  That's why they catching out.

10        And he called me a snitch, you know, You a snitch.  You

11   know, you need to quit talking like that.  If the door was

12   open, I would do this.  I would do that.  Not knowing that the

13   door was fixing to open.

14   Q.   Okay.  And when after that conversation were the doors

15   open?  How long after that?

16   A.   Like, five minutes, six minutes.

17   Q.   Okay.  And at that point is when he exited the cell --

18   his cell, got a broomstick, and attacked --

19   A.    No, sir.  He walked all the way around.  He walked -- he

20   was upstairs.  I was downstairs.  He walked all the way

21   around -- shower over this way.  He walked all the way around

22   to the shower, went over there and got the mopstick.  I seen

23   him get the mopstick, you know.  And when he came, I just

24   braced myself.  I knew he was getting ready to hit me with it.

25   Q.   Okay.  You know, just going back to the point, other than

```
 1    the interaction that you had where you thought he was high,
 2    you had had no other issues with him before this incident?
 3    A.   Not that I know of.
 4    Q.   All right.  You had never red tagged him at any point in
 5    time?
 6    A.   No, sir.
 7    Q.   Is that correct?
 8    A.   Yes, sir.
 9    Q.   And you yourself had a knife or a shank on you?
10    A.   Right.
11    Q.   Where did you get that?
12    A.   Where did I get it?  I bought it.
13    Q.   How long had you had that?
14    A.   I had it for a while.
15    Q.   Was that something you typically carried on yourself?
16    A.   Yes, sir.
17    Q.   It that something you had used before?
18    A.   No, sir.
19    Q.   But it was -- it was ordinary for you to carry that?
20    A.   Yes, sir.
21    Q.   Where did you carry it?
22    A.   I kept it on me.
23    Q.   Where?
24    A.   Around -- around here.
25    Q.   Around your waist area?
```

```
1    A.   Yes, sir.  It's dangerous in Wilkinson County.

2    Q.   And so once -- once y'all had your altercation, you

3    actually stabbed him several times, did you not?

4    A.   Maybe once.

5    Q.   One time?

6    A.   Yes, sir.

7    Q.   And during that altercation, a code black was called, was

8    it not?

9    A.   I'm pretty sure it was.

10   Q.   What is a code black?

11   A.   Somebody has been stabbed or somebody has been --

12   Q.   Does that initiate a response within the facility for

13   security officers --

14   A.   Yes, sir.

15   Q.   -- to then break up the altercation?

16   A.   Yes, sir.

17   Q.   And did that happen in this case?

18   A.   No.  We actually -- we actually stopped on our own.

19   Q.   Before they could get there?

20   A.   No.  They -- Sergeant Reece was in there.  She was there

21   inside the -- she was inside the zone at this time.

22   Q.   Okay.  But Sergeant Reece acted to break up the fight?

23   A.   But she didn't -- it wasn't no hands-on contact.  She

24   didn't -- it wasn't hands-on contact breaking it up.

25   Q.   So how did she -- how was it broken up?
```

1  A.  "Y'all stop."

2  Q.  Okay.  And y'all voluntarily stopped --

3  A.  Yeah.  Because I didn't want to hurt him.  I really

4  didn't want to hurt him.  I was just trying to defend myself

5  and get him off of me.

6  Q.  All right.  But when she gave the directive or the order

7  to stop, it was successful?  Y'all stopped fighting.  Yes?

8  A.  Yes, sir.

9  Q.  Were you taken to medical after this incident?

10  A.  Yes, sir.

11  Q.  Do you recall what they -- what they told you at medical?

12  A.  Well, I told them about my leg.  You know, they really

13  didn't care because it was just a stabbing going on, and I was

14  the bad guy.  But I really wasn't.  After they seen what

15  actually went on, okay, well, he's not the bad guy.  Let's see

16  what's going on with him now.  You know what I'm saying?

17  Q.  You mentioned a fractured leg.  Is that -- who told you

18  you had a fractured leg?

19  A.  Yes, sir.  On this side, my right side.

20  Q.  But who told you that about your leg?

21  A.  The doctor that was there.

22  Q.  On the first day that you were taken?

23  A.  No, sir, it wasn't the first day I was taken.  I had to

24  go to seg.  After I came out of seg, segregation, then I went

25  to medical.

```
 1   Q.   Okay.  Do you have any records from that visit?

 2   A.   Maybe -- I don't have it myself personally, no, sir.

 3   Q.   Okay.  Do you contend you're still -- you're still

 4   injured today from this incident?

 5   A.   Yes, sir.

 6   Q.   How so?

 7   A.   My leg's injured.  The chipped tooth right here, and this

 8   is a crack.  This -- it's all in here.  I wrote it all.

 9   Q.   All right.  Do you have copies of when you have ever

10   requested medical treatment?

11   A.   I be obtaining them.  I don't have them right now,

12   because this is Wilkinson County.  And I have to get these --

13   get this set from Wilkinson County.  Whatever I have, I got to

14   go about getting these things from these people.  You see what

15   I'm saying?  Because I'm in a new facility now.  I didn't stay

16   there long.  After this incident, I stay in Wilkinson County

17   maybe three months.  Now I'm in a new facility.  I'm in Greene

18   County.

19   Q.   Okay.  Going back to your allegations about

20   Mr. Schoettmer, if I understood you correctly, you are -- your

21   allegations against him pertain to how he handled the

22   investigation; is that right?

23        In other words, when you reported during the ARP process,

24   he concluded that you were the aggressor?

25   A.    Yes, sir.  Well, that's not -- that's not actually why.
```

1    Actually why, because whoever made this call, it came down

2    through and didn't nobody stop it.  With him being the

3    major -- from the warden down to the major to the sergeant,

4    somebody should have said, no, these -- these are C custody

5    inmates and these are medium custody inmates.  They are not

6    supposed to be out together.  But they didn't.

7    Q.    Okay.

8    A.    That's why I'm making the allegation.

9    Q.    So if he was involved in that decision-making, that would

10    be part of your complaint against him?

11    A.    Yes, sir.

12    Q.    And otherwise your only complaint is dealing with how the

13    investigation was handled?

14    A.    That's right.  But, now, I knew I wasn't the aggressor

15    anyway.  That just was, you know -- that has nothing -- really

16    nothing to do with nothing.  It's just assuming that how he

17    handled the situation all wrong, how he didn't pay attention

18    to his paperwork.  You know, how can he say I was the

19    aggressor when you see that I was hit first, and I was hit

20    with a weapon?  Unless you will be saying that his weapon is

21    more -- less than mines.

22    Q.    All right.  What are you seeking in this lawsuit?

23    A.    I really don't know, man.  I don't know, man.  Maybe some

24    money.  Maybe some money at the end of it or something, man.

25    But I feel like something that got to be done about -- as of

1   right now, to be honest with you and tell you the truth, I'm

2   on a zone right now with C custody inmates.  But it's not my

3   business to go over the head wardens and stuff like that and

4   make it be known.  You know, also, when I was stabbed, I was

5   stabbed by a C custody inmate.

6   Q.   Okay.  So like you said, you are at a different facility

7   now?

8   A.   Right.  But it's still C custody inmate on the zone with

9   me right now.

10  Q.   I got you.  Hold on just a second.

11       MR. JULIAN:  Your Honor, I have no further questions.

12       THE COURT:  Thank you, Mr. Julian.  I appreciate it.

13       Thank you, Mr. McAlister, for answering those questions

14    for us to the best of your ability.

15       And thank you for the questioning, Mr. Julian.

16    Appreciate that.  You had something else?

17       MR. JULIAN:  Your Honor, I'm still not entirely clear

18    if he is making a denial of medical care.  We had a prior

19    deadline to file ARP exhaustion motions.  And to the

20    extent -- if he is pursing a denial claim, I would want to

21    go back and see if we could file a motion on exhaustion

22    grounds as to that claim.  We did not file one on the

23    altercation itself.

24       THE COURT:  All right.  Okay.

25       THE PLAINTIFF:  I will be doing it.  I haven't done it

1   yet.  But yes, ma'am, I will be -- I will be doing it for

2   sure.

3        THE COURT:  We'll allow some time for that in our

4   omnibus order.  Thank you, Mr. Julian.

5        MR. JULIAN:  Thank you.

6        THE COURT:  We will certainly do so.  Because I think

7   it was mentioned in the fact section but not in the -- so I

8   can understand why you had not filed previously.  So we will

9   allow some time for that filing.

10       Okay.  Mr. McAlister, I saw on the docket that you did

11  try to provide your witness and exhibit list to us before

12  today.  I -- Ms. Spears has put on your table a form for the

13  witness and exhibit list so that you can provide a little

14  more detail to us as to who you intend to call to testify in

15  your case.

16       I will let you know that as far as inmate witnesses are

17  concerned, the Court limits those to three inmate witnesses,

18  and for those witnesses, we will be responsible for being

19  sure that they are transported here in the event that --

20  well, your trial will actually be in Natchez -- but will be

21  transported to the courthouse in Natchez should your case

22  proceed to trial.  So a maximum of three inmate witnesses.

23       There is not a limit on how many free-world witnesses

24  that you can have.  But for any free-world witnesses, you

25  would be responsible for bringing those folks to testify on

1    your own.  So you would be responsible for getting them

2    there.

3        Do you have any questions about the number of witnesses

4    that you could have?

5        THE PLAINTIFF:  No, ma'am.  But I was wanting to know

6    could I -- as a witness, can I put the cameras down?  That's

7    what I was trying to figure out.

8        THE COURT:  As far as, like, trying to seek video --

9        THE PLAINTIFF:  Yes, ma'am.

10       THE COURT:  -- the video footage of what happened?

11       You can list that.  We are going to go through a

12   process called "discovery" on the incident, and so you can

13   ask for that at that time.  Yes, sir.  You can list a

14   request.

15       THE PLAINTIFF:  I don't need to put it on here?

16       THE COURT:  Yes, sir.  You can put it on there.  That's

17   fine.  And so I'm going to give you -- you don't have to

18   turn that in right now.  I'll give you 14 days.

19       THE PLAINTIFF:  Oh, I can mail it back?

20       THE COURT:  Yes, sir.

21       THE PLAINTIFF:  Oh, okay.

22       THE COURT:  So you will have 14 days to mail that back

23   to us.  And as I briefly mentioned to Mr. Julian, what we

24   are going to do is enter what's called an "omnibus order,"

25   and that order is going to set forth various deadlines in

1    the case.  And so it will give you more information about

2    what's going to happen between now and if your case goes to

3    trial, what will happen at trial.  Okay?

4         So we will get that order on file, and a copy of it

5    will be sent to you.

6         Mr. Julian, do you have documents, witness/exhibit

7    list, to provide to Mr. McAlister?

8         MR. JULIAN:  I do, Your Honor.

9         THE COURT:  Okay.

10        MR. JULIAN:  I have defendants' witness list and

11   exhibit list and then our document production, which has

12   been marked Bates Number 1 to 41.

13        THE COURT:  All right.  And you can provide it to

14   Mr. McAlister.

15        And those are your first set of documents that you are

16   getting from the defense.  And, again, if you have documents

17   that you need to provide, and it sounds like you do, then

18   you will need to get those to Mr. Julian.  Actually, if you

19   send them here to the Court, we can get them loaded on to

20   the docket so that he can have access to them.  So if you

21   would mail any documents that you have that you want to use

22   to support your case, mail them back, and we will make sure

23   that Mr. Julian gets them.

24        All right.  Is there anything else for the defense

25   today, Mr. Julian?

1          MR. JULIAN:  No, Your Honor.

2          THE COURT:  All right.  Mr. McAlister, do you have

3     anything else?

4          THE PLAINTIFF:  No, ma'am.

5          THE COURT:  Okay.  Thank you.  I think that is going to

6     conclude our hearing for today, and so you are going to be

7     able to be transported back.  And, again, get that

8     information back to us in the next 14 days, and then also we

9     will get an order out to everyone setting forth further

10    deadlines in case.  Okay?

11         THE PLAINTIFF:  I'll be sure to do it.

12         THE COURT:  Yes, sir?

13         THE PLAINTIFF:  I said I'll be sure to do it.

14         THE COURT:  Okay.  Thank you.  I appreciate it.

15         Okay.  Thank you all so much.

16         MR. JULIAN:  Thank you.

17         THE COURT:  I hope everyone has a wonderful day, and

18    looking forward to working with you all on the case.

19         Oh, yes, sir, if you just leave it on the table so that

20    the next person will be able to use it.

21         Thank you.

22         THE PLAINTIFF:  Y'all have a nice day.

23         MR. JULIAN:  Thank you.

24         THE COURT:  Okay.  We stand adjourned.

25

1        (Court adjourned at 10:27 a.m.)

2    *****************************************************************

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **COURT REPORTER'S CERTIFICATE**

2

3          I, Caroline Morgan, Official Court Reporter for the

4  United States District Court for the Southern District of

5  Mississippi, do hereby certify that the above and foregoing

6  pages contain a full, true, and correct transcript of the

7  proceedings had in the forenamed case at the time and place

8  indicated, which proceedings were stenographically reported by

9  me to the best of my skill and ability.

10         I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13         THIS, the 17th day of November, 2023.

14

15                       /s/ Caroline Morgan, CCR

16                       Caroline Morgan CCR #1957
                             Official Court Reporter

17                       United States District Court
                             Caroline_Morgan@mssd.uscourts.gov

18

19

20

21

22

23

24

25